KELLOGG (SUTHERLAND v.). See Case No. 13,641.

KELLOGG (UNION MUTUAL LIFE INS. CO. v.). See Case No. 14,373.

# Case No. 7,667.

### KELLOGG v. WARMOUTH et al.[1]

Circuit Court, D. Louisiana. Dec. 6, 1872.

ELECTIONS—BILL TO PRESERVE EVIDENCE OF MATTERS OCCURRING DURING ELECTION—ELIGIBILITY—RETURNING BOARD.

[1. The acts to enforce the right of citizens to vote (16 Stat. 140, § 1); declaring the right (section 3); providing that the offer to perform any act required by law as a qualification for voting, if it fail to be performed by the wrongful act or omission of the officer, shall be deemed in law as a performance of the act; and section 23, providing that when any person shall be deprived of an election to certain offices, by the denial to any citizen offering to vote of his right to do so on account of race, color, or previous condition, his right to hold such office shall not be thereby impaired; also 16 Stat. 433, § 15, providing, among other things, that the jurisdiction of the circuit court shall extend to all cases, in law or equity, arising under the original or amendatory acts.—are constitutional, under the fifteenth amendment, and apply to the election of a state governor.]

[2. A bill for the preservation of evidence, to enable the complainant to prosecute a suit at law, alleging that 10,000 citizens of Louisiana have been deprived of registration, and a like number of votes suppressed on account of race, color, and previous condition, by an illegally

constituted returning board, and that without the interference of the court these votes will be lost to the complainant, and be thereby defeated for the office of governor, and supported by the affidavits of over 4,000 actual voters, is sufficient to give a circuit court jurisdiction, under 16 Stat. 146, §§ 1, 3, 23, and 16 Stat. 433, § 15.]

[Cited in Harrison v. Hadley, Case No. 6,137.]

[3. The question of the eligibility of the complainant for the office of governor cannot arise under such a bill, but could come before the court only on a direct action at law, to test the title to the office.]

[4. By Act La. March 16, 1870 [Laws La. 1870, p. 155, § 54], the returning board was made to consist of the governor, secretary of state, Mr. Lynch, and Mr. Anderson. The lieutenant governor and Mr. Anderson were disqualified by having been candidates. The governor attempted to remove Herron, the de facto secretary of state. Held, that the board, with the vacancies filled by the votes of Herron and Lynch, was the legal board, and should be protected by the court, and its status was not affected by Act La. Nov. 20, 1872, since Const. La. 1868, art. 122, provides that all officers shall continue to discharge the duties of their offices until their successors shall have been inducted into office, except in cases of impeachment or suspension.]

[This was a bill in equity to preserve evidence to enable the complainant to prosecute a suit at law, by William Pitt Kellogg against Henry C. Warmouth and others, alleging the suppression of votes on account of race, color, and previous condition of servitude.]

DURELL, District Judge. This application comes before me under a bill to preserve evidence to enable the complainant to prosecute a suit at law. This bill is well known to the courts of chancery, and is founded upon the statute, being chapter 104 of the 2d Session of the 41st Congress (16 Stat. 140), entitled "An act to enforce the rights of citizens of the United States to vote in the several states of this Union and for other purposes"; and upon the amendment to the same, being chapter 99 of the 3d Session of the same Congress (16 Stat. 433). Section 1 of the first act cited provides as follows: "That all citizens of the United States who are or shall be otherwise qualified by law to vote at any election by the people in any state, territory, district, county, city, parish, township, school-district, municipality or other territorial subdivision, shall be entitled and allowed to vote at all such elections without distinction of race, color, or previous condition of servitude, any constitution, law, custom, usage, or regulation of any State or territory, or by or under its authority to the contrary notwithstanding." Section 3 of the same act provides: "That whenever by, or under the authority or laws of any state, or the laws of any territory, any act is or shall be required to be done by any citizen as a pre-requisite to qualify or entitle him to vote, the offer of any such citizen to perform the act required to·be done as aforesaid shall if it fail to be carried into execu-

tion by reason of the wrongful act or omission aforesaid of the person or officer charged with the duty of receiving or permitting such performance or offer to perform or acting thereon be deemed and held as a performance in law of such act. And the person so offering and failing as aforesaid being otherwise qualified shall be entitled to vote in the same manner and to the same extent as if he had in fact performed such act." Section 23 provides as follows: "That whenever any person shall be defeated or deprived of his election to any office except elector of president or vice-president, representative, or delegate in congress, or member of a state legislature by reason of the denial to any citizen or citizens who shall offer to vote of the right to vote on account of race, color, or previous condition of servitude, his right to hold and enjoy such office and the emoluments thereof shall not be impaired by such denial." And section 15 of the amending act provides as follows: "That the jurisdiction of the circuit court of the United States shall extend to all cases in law or equity arising under the provisions of this act, or the act hereby amended, and if any person shall receive any injury to his person or property for, or on account of any act by him done, under any of the provisions of this act or the act hereby amended, he shall be entitled to maintain a suit for damages therefor in the circuit court of the United States in the district wherein the party doing the injury may reside or shall be found."

These two acts were passed by congress to enforce the provision of the constitution of the United States known as the "Fifteenth Amendment" (16 Stat. 1131), which reads as follows:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States, or by any state on account of race, color, or previous condition of servitude."

"Sec. 2. The congress shall have power to enforce this article by appropriate legislation."

The whole matter involved in the discussion which has occupied more than a week before me, has been presented on both sides with such ability, research, and fulness that I feel greatly indebted to the solicitors of both the complainant and the respondents for the aid which they have rendered in enabling me to come to an early decision.

The first question to be solved is. are the acts referred to constitutional? Do they fall within the appropriate legislation authorized and imposed as a duty upon congress by the second section of the amendment? To solve this question, we must look to the object proposed to be attained by the amendment. It was to protect all citizens of the United States, including the recently emancipated and enfranchised colored citizens, in the full and free exercise of the right to vote. Nine years previous to the adoption of the amendment, and the enactment of the statutes passed to enforce the same, four millions of those who now constitute the great body of the citizens of the United States were slaves. It is not necessary here to repeat the history of slavery in this country; how it was, and continued to be. from the very foundation of our government, a source of internal disquiet, increasing year by year, until it culminated in a most bitter and devastating civil war. The result of that war was the emancipation and enfranchisement of four millions of people, who thus passed rapidly from a state of bondage to the possession of all the civil and political rights of citizens of the United States. It was impossible that so large a body of people should be suffered to remain exposed to the assaults of the prejudices naturally growing out of their former condition, without securing to them, through congressional legislation, a free and perfect use of the vote which the fifteenth amendment gave to them as a shield and a sword of protection for their persons, their liberties. and their property.

Congress has legislated and given us the acts referred to as the means most appropriate for effecting the object proposed. These acts have been highly eulogized by the solicitors on both sides, and they seem to me to be most wise and in the highest sense appropriate. (The provision of the constitution, that no state shall pass a law impairing the obligations of contracts, needed no legislation to enforce it, beyond giving the right of review in the supreme court of the United States to the party feeling himself aggrieved.) It is to be remarked that the fifteenth amendment is most broad in its comprehensiveness. Though called into existence in order to protect the freedman, it protects as well all other citizens, both native and foreign. It would protect the foreigner who had become a citizen, should another Know Nothing excitement agitate the nation; and it would protect the native-born. should the foreign-born citizen ever gain in any state or locality an ascendancy, and attempt to use that ascendancy oppressively. The same may be said of the acts of congress to give practical effect to the amendment. But. in the case of the fifteenth amendment. "the helplessness of the party to be protected rendered a larger and peculiar legislation necessary.

Congress, then. in the acts under consideration, threw around all classes of citizens these effective laws, and secured obedience thereto —First. by criminal punishment; and, second. by clothing the candidate of the voter with the right to prevent or redress the wrong attempted or perpetrated upon the voter, by an appropriate civil action or procedure.

Now. what are the grievances set forth in this case? What are the allegations made

in the bill? They are that ten thousand citizens of this state have been, on account of race, color, and previous condition, deprived of registration, and, after due proffer, of the right to vote; and that ten thousand votes which were in fact cast for the complainant for the office of governor have been, or are about to be, suppressed by an illegally constituted board of returning officers; and that, without the interference of this court, these votes, both those refused and those cast, which ought to be counted for the complainant, will be lost to him, and that thereby he will be defeated for said office. These allegations are supported by upwards of four thousand affidavits of the actual voters. The chief defendant, namely, H. C. Warmouth, meets this weight of testimony solely by his answer and affidavit; and certainly acts done by him since the canvass commenced force upon my mind the belief that his defense rests upon no solid foundation. The further allegation is made that the board of canvassers legally constituted are deprived by this respondent of the proper returns, with the view to deprive citizens of the right to vote. In other words, that the respondent has prevented a fair canvass of the votes by impeding the legal board and setting up an illegal board. This leads me to consider the facts with reference to these two boards.

By an act of the state legislature of March 16, 1870, the board of returning officers was made to consist of the governor, lieutenant governor, secretary of state, Mr. Lynch, and Mr. Anderson. The lieutenant governor and Mr. Anderson being disqualified on account of having been candidates, the governor, Lynch, and Herron, as a majority of the board, met to fill vacancies. The governor attempted to remove Herron, who was certainly de facto secretary of state, who seems to have some sort of judgment in his favor against Bovee, the elected secretary of state, who has for a long period attested all the statutes of the state, and who, without going into his title to the office as against Bovee, was the de facto officer, clothed with sufficient authority to act as one of the board. The attempt to remove Herron I dismiss with the remark that, if all the governor alleges against him had been true, it could have been established only by judicial inquiry, and gave the governor no right to displace him. Herron and Lynch, by a majority vote, filled the vacancies by electing Hawkins and Gen. Longstreet, and these four, together with the governor, are clearly the legal board of returning officers. Wharton's vote goes for nothing, as he never had any legal status in the board, and with him necessarily fall out Duponte and Hatch. Thus it appears that the board which we will call the "Herron Board," in contradistinction to the "Wharton Board," is the board which this court feels bound to recognize as having been the legal board at the time this suit was commenced. And this brings me to inquire as to the ef-

fect of the approval by the governor of the act of November 20, 1872. The only question before me at this stage of the case, connected with the effect of that approval, is, did it change in any way the legal status of the Herron board? The act contained a repealing clause, and since it covered the whole subject of the election, and the election cannot be said to be complete until the final counting is concluded, I was at first startled by what seemed to me to be the logical inference of some of the authorities cited by the learned solicitors of the respondents, that if the act of 1870 was at that time repealed it might vitiate the whole election. But it is not necessary for me to pass upon this question, for, giving the act of November 20th all the force of law, still the Herron returning board must continue to discharge their duties until their successors are inducted into office. Article 122 of the state constitution of 1868 reads thus: "All officers shall continue to discharge the duties of their offices until their successors shall have been inducted into office except in cases of impeachment, or suspension." Indeed, the Herron board must furnish the canvass of the votes, or a new legislature cannot be legally organized so as to create a board of canvassers in accordance with sections 2 and 44 of the law of the 20th of November, 1872. I see, therefore, no way of avoiding the conclusion that, in any view of the case, the Herron board of returning officers are still authorized to continue their duties, and are still entitled to the protection of this court.

The court keeps within the acts of congress and the fifteenth amendment. It does not pretend in any way to make a governor of the state, or in any degree to interfere with the voice of the people expressed through the ballot box. What it does is to aid in making known the voice of the people in accordance with sections 3 and 23 of the act of congress, and with section 15 of the amendment thereto, and in its action is only a clearly needed adjunct of the legal returning board. Many propositions were discussed during the argument which it is not necessary for me to now pass upon. It is enough that I find the statute constitutional, that the court has jurisdiction, and that the board of returning officers, composed of H. C. Warmouth, and Messrs. Hawkins, Lynch, Longstreet, and Herron, are the legal board, and, as such, entitled to the protection of this court.

As to the question of the ineligibility of the complainant in the bill to the office of governor, this question cannot arise under the bill, and could only come before this court in a direct action at law, to test the title to the office. It is not, therefore, necessary or proper for me to decide it now; but, were it otherwise, I would say that the reason of the thing seems to favor his eligibility, the object of the provision of the constitution being to prevent a man serving two masters, and having a divided allegiance. And the

fact that contemporaneously with the adoption of the constitution which first contained this provision the then territorial governor was by the then constitutional convention made governor of the state provisionally, and at the ensuing election made by the people the first governor of the state, would seem to indicate that the meaning of the inhibition was understood to be as I. have above stated.

[NOTE. Application was made by Gov. Warmouth to the supreme court for a writ of prohibition or writ of certiorari forbidding the circuit court from further proceeding in this cause, or commanding them to send a certified transcript of proceedings to the supreme court, to be there proceeded with according to law, upon this petition. Mr. Chief Justice Waite delivered the following opinion of the court: "We are all of opinion that, when a final decree shall be rendered in the circuit court in this case. an appeal will lie to this court. We are also of opinion that this court has no jurisdiction in this case to issue a writ of prohibition until an appeal is taken." Ex parte Warmouth, 17 Wall. (84 U. S.) 67.]